DAN PILSON AUTO CENTER, INC., Plaintiff-Appellant, v. WILLIAM DeMARCO, as Sheriff of the County of Sangamon, Defendant-Appellee.

Fourth District   No. 4—86—0773

Opinion filed June 10, 1987.

Brent D. Holmes, of Harlan Heller, Ltd., of Mattoon, for appellant.

Donald M. Cadagin, State's Attorney, of Springfield (Elizabeth L. Collins, Assistant State's Attorney, of counsel), for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

The plaintiff, Dan Pilson Auto Center, Inc., brought a replevin action seeking to recover possession of six automobiles from the defendant, William DeMarco, the sheriff of Sangamon County. Following a hearing on the matter, the circuit court of Sangamon County denied Pilson's complaint for replevin. Pilson appeals the order of the circuit court.

On appeal, Pilson maintains: (1) the decision of the circuit court is contrary to the evidence, thus entitling him to possession of the cars as a matter of law; and (2) the sheriff may not prevail as a "buyer in the ordinary course" as he was on notice of possible defects in title. We reverse and remand.

At the hearing, Dan Pilson, president of Dan Pilson Auto Center located in Mattoon, Illinois, testified that he had entered into an oral agreement to sell six used squad cars to Leo Palmeri. Palmeri was a buyer for Fleet Automotive, a Rockford dealership specializing in fleet transactions. Pilson and Palmeri conducted all negotiations by telephone, which, according to Pilson, was the customary manner of conducting wholesale fleet transactions.

At the time the agreement was made, Pilson was not yet in possession of the cars. Under the terms of the agreement, Pilson was to contact Palmeri upon receipt of the vehicles. Then Palmeri was to come to Mattoon to make an inspection of the cars, and assuming no problems existed, Pilson and Palmeri were to exchange car titles and possession for a cashier's check.

Pilson contacted Palmeri shortly after the agreement was made to inform him that the squad cars would be coming in later than anticipated. Pilson testified that Palmeri indicated some concern with respect to the delivery date because he had already arranged for sale of the cars and his customer was becoming anxious. The vehicles arrived in early April, and on April 11, 1986, Palmeri was informed the vehicles were ready for his approval. Palmeri indicated that he would

come to Mattoon immediately to pick up the vehicles and close the deal.

Palmeri contacted Pilson later that same day and told Pilson that his customer was the Sangamon County sheriff. Palmeri asked Pilson if it would be all right if the sheriff picked up the cars, as the sheriff was anxious to get the vehicles. Palmeri indicated that he would be arriving shortly after the sheriff's men, but that Pilson should allow the sheriff to take the cars. Pilson agreed to the arrangement.

Captain Pyle of the Sangamon County sheriff's department arrived at Pilson's dealership. Pyle inspected the vehicles and then expressed some concern with respect to the mileage and condition of the tires on the squad cars. Pilson stated that he informed Pyle that his transaction with Palmeri was not yet complete and that any price adjustments could be made later by Palmeri. Pyle then signed a "delivery receipt" and took possession of the cars.

Pilson further testified that at the time he released possession of the cars, he was unaware of the fact that Pyle, on behalf of the sheriff's department, had already tendered payment to Fleet Auto. Pilson, however, maintained that his transaction was strictly with Palmeri. Palmeri never showed on April 11 and never paid Pilson for the six squad cars. Pilson is still in possession of the certificates of title.

Captain John Pyle, director of support services for the Sangamon County sheriff's department, testified that he entered into an agreement with Palmeri to purchase 19 squad cars. Pyle indicated that he had engaged in one previous transaction with Palmeri. It was Pyle's understanding that Palmeri would obtain squad cars from other dealers and notify the sheriff's department as the cars became available.

Pyle stated that he received one car from Palmeri in January and two cars in February of 1986. Pyle paid for each vehicle upon receipt of possession. In early April, Pyle was informed of the six cars in Mattoon. Pyle testified that on April 10, 1986, he tendered a cashier's check in the amount of $25,000 to Fleet Automotive for the vehicles. Pyle was told that the vehicles could be picked up in Mattoon. Pyle stated that he then went to Mattoon, where he received possession of three cars. Pyle returned the next day and picked up the remaining three cars. On cross-examination, Pyle admitted that it was not departmental policy to pay for vehicles prior to receiving title and possession.

Pyle further testified that prior to taking possession of the cars, he signed a delivery receipt. Pyle stated that he did not receive the titles to the cars. It was Pyle's understanding that he would receive the titles once Palmeri paid for the vehicles. Pyle acknowledged that

the cars were given to him as an accommodation to the department so that they might begin painting and altering the vehicles. Pyle additionally admitted that he was aware that Pilson had not been paid for the cars. Pyle understood that Pilson was not going to release the titles until payment was made.

Upon receipt of the vehicles, the sheriff's department painted the cars and installed radio equipment. Pyle indicated that the cost of the alterations was approximately $2,000 per car. Pyle additionally testified that the sheriff's department had never received titles for the vehicles.

■ Initially, there is a dispute with respect to the applicable standard of review. The plaintiff, Pilson, maintains that since there were no disputed facts, the manifest weight standard is inapplicable. Pilson's contention misconstrues the applicable law. The major issue in this action was the ownership of the vehicles. It is well established that the determination of ownership, transfer of title, and whether a party qualifies as a "buyer in the ordinary course of business" is a question of fact for the trial court to determine. (See *American National Bank & Trust Co. v. Mar-K-Z Motors & Leasing Co.* (1974), 57 Ill. 2d 29, 309 N.E.2d 567; *Country Mutual Insurance Co. v. Aetna Life & Casualty Insurance Co.* (1979), 69 Ill. App. 3d 764, 387 N.E.2d 1037.) Since the trial court is in a superior position to assess the credibility of the parties and weigh the evidence in this respect, its decision must stand unless it is contrary to the manifest weight of the evidence.

Pilson initially maintains that he is entitled to judgment for replevin as a matter of law because the sheriff did not receive the certificates of title upon taking possession of the cars. In support of this contention, Pilson cites to numerous authorities from other jurisdictions which indicate that failure to transfer title and possession simultaneously results in a defective transfer.

■ ■ Under established law in Illinois, it is clear that although the Illinois Vehicle Code requires a transfer of certificate of title to effectuate the sale of a vehicle (Ill. Rev. Stat. 1985, ch. 95½, par. 3–112(a)), it is not necessarily determinative of the passage of ownership. (*Country Mutual Insurance Co. v. Aetna Life & Casualty Insurance Co.* (1979), 69 Ill. App. 3d 764, 387 N.E.2d 1037.) It is the intent of the parties involved and not such statutory prerequisites which determines ownership. (*In re Robison* (7th Cir. 1981), 665 F.2d 166; *Country Mutual Insurance Co. v. Aetna Life & Casualty Insurance Co.* (1979), 69 Ill. App. 3d 764, 387 N.E.2d 1037.) Consequently, it is possible that one can own an automobile even though the

certificate of title is in the name of another. *Country Mutual Insurance Co. v. Aetna Life & Casualty Insurance Co.* (1979), 69 Ill. App. 3d 764, 387 N.E.2d 1037, quoting *State Farm Mutual Automobile Insurance Co. v. Lucas* (1977), 50 Ill. App. 3d 894, 898, 365 N.E.2d 1329, 1332.

■ Evidence clearly established that Pilson never transferred the certificates of title for the squad cars. Pilson claimed and Pyle confirmed that the cars were transferred along with a "delivery receipt." Both parties further acknowledged that the cars were released to Pyle as "an accommodation to the sheriff," who was in dire need of additional squad cars. Testimony established the existence of two separate sales contracts: the first between Pilson and Palmeri, and the second between Palmeri and Pyle on behalf of the Sangamon County sheriff. Although possession was surrendered, both parties understood that their separate transactions were not yet complete. Pyle knew he would not receive title until Palmeri paid Pilson. While the failure to transfer certificates of title alone might be insufficient to sustain a finding for Pilson, this fact, in conjunction with evidence of the parties' intent, indicates that although possession passed, there was no concurrent intent to transfer ownership.

It is well established that a purchaser of goods can only acquire the title which the seller possessed or had the power to transfer. (Ill. Rev. Stat. 1985, ch. 16, par. 2—403(1).) The Uniform Commercial Code (UCC) does, however, provide exceptions wherein a purchaser of goods may acquire title superior to that of the seller. For example, a person with voidable title has power to transfer a good title to a good-faith purchaser for a value. (Ill. Rev. Stat. 1985, ch. 26, par. 2—403(1).) In the case at hand, however, Palmeri, the seller, had no title at all and thus, the statutory provisions regarding voidable title are inapplicable.

■ The UCC additionally provides that if goods are entrusted to a "merchant who deals in goods of that kind," the merchant has "power to transfer all rights of the entruster to a buyer in ordinary course of business." (Ill. Rev. Stat. 1985, ch. 26, par. 2—403(2).) An entrustment requires four essential elements: (1) an actual entrustment of the goods by the delivery of possession of those goods to a merchant; (2) the party receiving the goods must be a merchant who deals in goods of that kind; (3) the merchant must sell the entrusted goods; and (4) the sale must be to a buyer in the ordinary course of business. *Shacket v. Roger Smith Aircraft Sales, Inc.* (N.D. Ill. 1980), 497 F. Supp. 1262.

At trial, the sheriff relied upon two entrustment cases (*Coffman*

*Truck Sales v. Sackley Cartage Co.* (1978), 58 Ill. App. 3d 68, 373 N.E.2d 1026; *Humphrey Cadillac & Oldsmobile Co. v. Sinard* (1967), 85 Ill. App. 2d 64, 229 N.E.2d 365) in support of his position. These cases, however, must be distinguished.

In *Coffman*, a truck dealer consigned trucks to a second dealer, who in turn sold the trucks to a consumer. After the consignee went out of business, the dealer brought a replevin action against the consumer. (*Coffman Truck Sales v. Sackley Cartage Co.* (1978), 58 Ill. App. 3d 68, 373 N.E.2d 1026.) In *Coffman*, the court noted that it was the plaintiff who was the original dealer who had placed the trucks into stream of commerce and was well aware that Interstate intended to sell them. The trial court also recognized that plaintiff had waited 2½ months before attempting to collect payment from Interstate.

In the instant case, Pilson would be similar to plaintiff Coffman; Interstate would be similar to Palmeri; and the Sangamon County sheriff would be the analogous purchaser. Even a comparison of the factual situation in *Coffman* is inapposite to the present case. Pilson did not entrust the possession of the vehicles to Palmeri. Pilson told the sheriff through its representative, Pyle, that the title would not be transferred, that the cars had not been paid for and that until the cars were paid for, the titles to the vehicles would not be transferred to any purchaser.

Similarly, in *Humphrey*, a wholesale automobile dealer sought to replevy cars from a consumer who had purchased from a retail dealer to whom the cars were wrongfully transferred. (*Humphrey Cadillac & Oldsmobile Co. v. Sinard* (1967), 85 Ill. App. 2d 64, 229 N.E.2d 365.) The evidence showed that the plaintiff, through its agent, an employee, allowed Cadillacs to be sold to a retail dealer who was in the business of selling automobiles and to whom automobiles had been sold in the past. The retail dealer in turn sold the automobiles to the defendants. The *Humphrey* court found as to the defendant purchasers that "neither defendant *** had knowledge nor should they have been put on notice that something was unusual about the sales involved in this case. Moreover, both defendants made attempts to obtain their titles from plaintiff and were assured that titles would be forthcoming." In this context, *Humphrey* is inapposite and not helpful to the defendant. The evidence herein showed that the sheriff was put on notice that something was unusual about the sale. The sheriff knew that the titles would not be received until Pilson was paid by Palmeri. There was no assurance to the sheriff that his titles would be forthcoming until Pilson was paid. Although Pilson delivered

possession of six squad cars to Pyle on behalf of the sheriff, the sheriff was the purchaser in a separate sales contract. The sheriff was not an automobile dealer and cannot in any way be construed as a "merchant who deals in goods of that kind." As such, there was no entrustment of the cars.

Since there was no entrustment of the cars by Pilson, there is little need to address the "buyer in the ordinary course" argument. There are no good faith or lack of notice requirements for mere purchasers. We feel this case involved two distinctly separate contracts for the sale of automobiles. Pilson and Palmeri needed to complete their contract in order for the sheriff's contract to be executed. Because Palmeri never fulfilled his contractual obligations, the second contract could never be realized. The sheriff could only obtain title from Palmeri. Since Palmeri had nothing to convey, the sheriff never received title to the cars. As such, the decision of the circuit court is reversed.

Reversed and remanded for further proceedings.

SPITZ, P.J., and LUND, J., concur.